## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MARK MARKHAM, individually and on behalf of all others similarly situated,<br><br>                            Plaintiff,<br><br>   v.<br><br>NATIONAL GEOGRAPHIC PARTNERS, LLC,<br><br>                        Defendant. | Civil Action No.:  19-cv-00232<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mark Markham ("Plaintiff"), individually and on behalf of himself and all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## INTRODUCTION

1.    Between March 26, 2016 and July 30, 2016, Defendant National Geographic Partners, LLC ("National Geographic") rented, exchanged, and/or otherwise disclosed personal information about Plaintiff Mark Markham's *National Geographic* magazine subscription to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed his information to aggressive advertisers, political organizations, and non-profit companies.  As a result, Mr. Markham has received a barrage of unwanted junk mail.  By renting, exchanging, and/or otherwise disclosing Mr. Markham's Personal Reading Information (defined below) between March 26, 2016 and July 30, 2016, National Geographic violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich.

1989) (the "PPPA").[1]

2.     Documented evidence confirms these facts. For example, National Geographic, through a list broker, Specialists Marketing Services, Inc. ("SMS"), offers to provide renters access to the Personal Reading Information of 1,016,555 active subscribers from the "National Geographic Magazine Member/Subscribers" mailing list at a base price of "$105/M [per thousand]," (i.e., 10.5 cents apiece).

---

[1] In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq*.). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods*., 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop, Corp.*, No. 18-cv-00596-GJQ-PJG, Dkt. 18 at 3-5 (W.D. Mich. 2018).

# National Geographic Magazine
# Member/Subscribers



**SEGMENTS:**

| | | | |
|---|---|---|---|
| 1,016,555 | Total Universe | | $105.00/M |
| 58,407 | 1 Month Hotline | $20.00/M | $105.00/M |
| 278,504 | 3 Month Hotline | $15.00/M | $105.00/M |
| 499,630 | 6 Month Hotline | $10.00/M | $105.00/M |
| 738,573 | 12 Month Hotline | | $105.00/M |
| 252,977 | 12 Month Expires | | $80.00/M |
| | Non Profit Rate | | $80.00/M |
| | Fundraiser Rate | | $75.00/M |
| | Catalog Rate | | $85.00/M |

**PROFILE:**

National Geographic Member/Subscribers receive the legendary magazine, along with wall maps, special pricing on books and other products, and opportunities to travel with National Geographic Expeditions. Members are also supporters of science, conservation,and educational projects around the world.

They are affluent, well educated, inquisitive consumers seeking the insider's point of view and National Geographic Magazine's storied expertise and global connection. Members are interested in the environment, cultural issues, historic events, and travel.

They are perfect for publishing, books, membership, fundraising, catalog, collectibles, gifts, insurance, and financial publications.

29% Professional
66% Married
66% College Educated

**SELECTIONS:**

| | |
|---|---|
| Product Affinities | $15.00/M |
| Gender | $8.00/M |
| New to File | $12.00/M |
| Renewals | $12.00/M |
| Paid | $8.00/M |
| Source | $12.00/M |
| Scf | $8.00/M |
| State | $8.00/M |
| Zip | $8.00/M |
| Key Coding | $1.00/M |

**ADDRESSING:**

| | |
|---|---|
| FTP | $75.00/F |



Counts Through: 02/28/2019
Next Update: 04/15/2019

SOURCE:
100% Direct Mail

GENDER:
Male 58%
Female 32%

DEMOGRAPHICS:
Average Age 50
Average HHI $82,000

UNIT OF SALE:
$34.00 U.S./12 Issues
$46.00 Canadian/12 Issues

MINIMUM ORDER:      UPDATES:
7,500      Monthly

NET NAME ARRANGEMENTS:
Net 85% R/C $10.00/M Minimum 50,000

TERMS AND CONDITIONS:

Orders cancelled post merge or on/after mail date require payment in full. Orders cancelled before mail date will be subject to a $100/F cancellation fee, $15/M Running Charges and applicable selection charges i.e. enhanced selections and applicable shipping/media fees.

For detailed recommendations, please contact:
Cyndi Lee x2203; cyndilee@sms-inc.com

For counts, usage and orders, please contact:
Monica Drakeford x2119; monicdra@sms-inc.com
Judy Clancy x2214; JudyCla@sms-inc.com

**SPECIALISTS**
MARKETING SERVICES

777 Terrace Avenue, Suite 401 Hasbrouck Heights NJ 07604 201-865-5800 www.sms-inc.com

*See* Complaint Ex. B.

3.      Renters are able to access the Personal Reading Information of National

Geographic subscribers based on, but not limited to, "product affinities," "gender," and whether

they are "paid."  *Id.*

4.      National Geographic, through SMS, also offers access to its "Enhanced

Masterfile" list at the same base rate of "$105/M."

## National Geographic Enhanced Masterfile

NATIONAL GEOGRAPHIC™

SEGMENTS:

| | | | |
|---|---|---|---|
| 1,237,085 | Total Subs Universe | | $105.00/M |
| 75,765 | 1 Month Subs Hotline | $20.00/M | $105.00/M |
| 328,266 | 3 Month Subs Hotline | $15.00/M | $105.00/M |
| 581,384 | 6 Month Subs Hotline | $10.00/M | $105.00/M |
| 843,665 | 12 Month Subs Hotline | | $105.00/M |
| 185,201 | Total Buyers Universe | | $105.00/M |
| 2,538 | 1 Month Buyers Hotline | $20.00/M | $105.00/M |
| 6,102 | 3 Month Buyers Hotline | $15.00/M | $105.00/M |
| 17,344 | 6 Month Buyers Hotline | $10.00/M | $105.00/M |
| 64,638 | 12 Month Buyers Hotline | | $105.00/M |
| | Non Profit Rate | | $80.00/M |
| | Fundraiser Rate | | $75.00/M |
| | Catalog Rate | | $85.00/M |

Counts Through:   02/28/2019
Next Update:   04/15/2019

PROFILE:
The National Geographic Enhanced Masterfile is a de-duped file including members/subscribers to National Geographic magazine, National Geographic History Magazine, National Geographic Traveler magazine, buyers of National Geographic Catalog, Books, Video and DVD products.

These subscribers, members and buyers have been enhanced with rich lifestyle, demographic, ethnic and purchasing behavior data.  With over 100 variables to select from the National Geographic Enhanced Masterfile can pinpoint the right segment for any mailer's offer.

National Geographic subscribers/members and buyers are affluent, well educated, and motivated consumers with diverse interests in our ever changing global scene.

SOURCE:
Direct Mail/Direct Response

GENDER:
58% Male
24% Female

DEMOGRAPHICS:
Average age 50
Average HHI $82,000

UNIT OF SALE:
$45.00

MINIMUM ORDER:          UPDATES:
7,500                              Monthly

SELECTIONS:

| | |
|---|---|
| Gender | $8.00/M |
| Renewals | $12.00/M |
| Paid | $8.00/M |
| Source | $12.00/M |
| Lifestyle Interest Data | $15.00/M |
| Demographic Data | $15.00/M |
| Ethnic/Religion | $15.00/M |
| Families w/Children | $15.00/M |
| Scf | $8.00/M |
| State | $8.00/M |
| Zip | $8.00/M |
| Key Coding | $1.00/M |

NET NAME ARRANGEMENTS:
Net 85%  R/C $10.00/M  Minimum 50,000

TERMS AND CONDITIONS:
Orders cancelled post merge or on/after mail date require payment in full. Orders cancelled before mail date will be subject to a $100/F cancellation fee, $15/M Running Charges and applicable selection charges i.e. enhanced selections and applicable shipping/media fees.

For detailed recommendations, please contact:
Cyndi Lee x2203; cyndilee@sms-inc.com

For counts, usage and orders, please contact:
Monica Drakeford x2119; monicdra@sms-inc.com
Judy Clancy x2214; JudyCla@sms-inc.com

ADDRESSING:

| | |
|---|---|
| Ftp | $75.00/F |

Lifestyle Interest/Demographic/Ethnic & Religion Interests @ $15/M:

**Gourmet Food/Cooking**
Gourmet Cooking      662,825

**Health/Self-Improvement**



**SPECIALISTS** MARKETING SERVICES      777 Terrace Avenue, Suite 401  Hasbrouck Heights  NJ 07604  201-865-5800  www.sms-inc.com

*See* Complaint Ex. C.  The "Enhanced Masterfile" list is "enhanced with rich lifestyle,

demographic, ethnic and purchasing behavior data," such as whether the subscriber is a

"Republican" or a "Democrat," "Income," and "Ethnic."  *Id.*

5.     National Geographic, through SMS, also offers to provide renters access to the

Personal Reading Information of 150,333 book buyers from the "National Geographic Book

Buyers" list at the same base rate of "$105/M."



## National Geographic Book Buyers

**SEGMENTS:**

| | | | |
|---|---|---|---|
| 150,333 | Total Buyers | | $105.00/M |
| 1,392 | 3 Month Hotline Buyers | $15.00/M | $105.00/M |
| 11,787 | 6 Month Hotline Buyers | $10.00/M | $105.00/M |
| 56,991 | 12 Month Buyers | | $105.00/M |
| | Fundraising Rate | | $75.00/M |
| | Non Profit Rate | | $80.00/M |
| | Catalog Rate | | $85.00/M |

**PROFILE:**
National Geographic Book Buyers are motivated, culturally aware, and interested in exploring their world through award-winning pictorial pages of National Geographic's signature book collection.

They have a thirst for knowledge about the world in areas such as science and health, nature, photography, geography, birding, religion and history. These buyers enjoy national, state parks, and country/city specific guidebooks from the foremost experts in travel as well as a variety of fun and educational children's books. They buy for their own libraries as collectibles or as gifts for adults and children alike.

These affluent, well educated consumers with diverse interests and are a perfect fit for publishing, gift catalogs, collectibles, fundraising, recreation and financial publications, and more.

**SELECTIONS:**

| | |
|---|---|
| Product Affinities | $15.00/M |
| Gender | $8.00/M |
| Multi Buyers | $8.00/M |
| Paid | $8.00/M |
| Scf | $8.00/M |
| Zip | $8.00/M |
| State | $8.00/M |
| Key Coding | $1.00/M |
| $50+ Buyer | $20.00/M |
| $100+ Buyer | $35.00/M |
| $150+Buyer | $45.00/M |

**ADDRESSING:**

| | |
|---|---|
| FTP | $75.00/F |

Product Affinites @ $15/M:

| | |
|---|---|
| Children's | 97,591 |
| Health | 83,178 |
| History | 196,834 |
| Nature | 156,851 |
| Reference | 116,930 |
| Religion | 90,666 |
| Science | 150,602 |
| Travel | 95,935 |
| World Culture | 110,073 |

Counts Through:   07/31/2018
Next Update:   04/15/2019

SOURCE:
Direct Mail/Internet

GENDER:
52% Male
30% Female

DEMOGRAPHICS:
Average HHI $80,000

UNIT OF SALE:
$45-$50

| MINIMUM ORDER: | UPDATES: |
|---|---|
| 7,500 | Monthly |

NET NAME ARRANGEMENTS:
Net 85%   R/C $10.00/M   Minimum 50,000

TERMS AND CONDITIONS:
Orders cancelled post merge or on/after mail date require payment in full. Orders cancelled before mail date will be subject to a $100/F cancellation fee, $15/M Running Charges and applicable selection charges i.e. enhanced selections and applicable shipping/media fees.

For detailed recommendations, please contact:
Cyndi Lee x2203; cyndilee@sms-inc.com

For counts, usage and orders, please contact:
Judy Clancy x2214; JudyCla@sms-inc.com
Monica  Drakeford x2119; moniodra@sms-inc.com



**SPECIALISTS**
MARKETING SERVICES         777 Terrace Avenue, Suite 401  Hasbrouck Heights  NJ 07604  201-865-5800  www.sms-inc.com

*See* Complaint Ex. D.  According to the listing, National Geographic book buyers are "affluent,

well educated consumers … and are a perfect fit for … gift catalogs [and] fundraising." *Id.*

6.      By renting, exchanging, or otherwise disclosing the Personal Reading

Information of its Michigan-based subscribers between March 26, 2016 and July 30, 2016,

National Geographic violated the PPPA.  Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the
> business of selling at retail, renting, or lending books or other
> written materials ... shall not disclose to any person, other than the
> customer, a record or information concerning the purchase ... of
> those materials by a customer that indicates the identity of the
> customer.

PPPA § 2.

7.      Accordingly, Plaintiff brings this Class Action Complaint against National

Geographic for its intentional and unlawful disclosure of its customers' Personal Reading

Information in violation of the PPPA, and for unjust enrichment.

## NATURE OF THE CASE

8.      To supplement its revenues, National Geographic rents, exchanges, or otherwise

discloses its customers' personal information—including their full names, titles of magazines

subscribed to, and home addresses (collectively "Personal Reading Information"), as well as

myriad other personal, lifestyle, and demographic information such as gender, age, ethnicity,

income, religion, parental status, and political affiliation—to data aggregators, data appenders,

data cooperatives, and other third parties without the written consent of its customers.

9.      By renting, exchanging, or otherwise disclosing – rather than selling – its

customers' Personal Reading Information, National Geographic is able to disclose the

information time and time again to countless third parties.

10.      National Geographic's disclosure of Personal Reading Information, and other

personal, demographic, and lifestyle information is not only unlawful, but also dangerous

because it allows for the targeting of particularly vulnerable members of society.  In fact, almost any organization can rent a customer list from National Geographic that contains a number of categories of detailed subscriber information.  For example, almost any organization could rent a list with the names and addresses of all *National Geographic* customers who are African-American, Republican, over the age of 50, and with a net worth of greater than $500,000.

11.     While National Geographic profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Personal Reading Information and other personal information, it does so at the expense of its customers' privacy and statutory rights because National Geographic does not obtain its customers' written consent prior to disclosing their Personal Reading Information.

## PARTIES

12.     Plaintiff Mark Markham is a natural person and citizen of the State of Michigan. Plaintiff Markham is a subscriber to *National Geographic* magazine, and was a subscriber between March 26, 2016 and July 30, 2016, as well.  *National Geographic* magazine is published by National Geographic Partners, LLC.  While residing in, a citizen of, and present in Michigan, Plaintiff Markham purchased his subscription to *National Geographic* magazine directly from National Geographic.  Prior to and at the time he subscribed to *National Geographic*, National Geographic did not notify Plaintiff Markham that it discloses the Personal Reading Information of its customers, and Plaintiff Markham has never authorized National Geographic to do so. Furthermore, Plaintiff Markham was never provided any written notice that National Geographic rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *National Geographic*, and between March 26, 2016 and July 30, 2016, National Geographic disclosed, without consent or prior notice, Plaintiff Markham's Personal Reading Information to data aggregators, data appenders, and/or data

cooperatives, who then supplement that information with data from their own files.  Moreover, during that same period, National Geographic rented or exchanged mailing lists containing Plaintiff Markham's Personal Reading Information to third parties seeking to contact National Geographic subscribers, without first obtaining Plaintiff Markham's written consent or even giving him prior notice of the rentals, exchanges, and/or other disclosures.  Because National Geographic rented, exchanged, and/or otherwise disclosed his Personal Reading Information, Plaintiff Markham now receives junk mail from charities and other organizations that do not offer products or services to consumers.  These unwarranted mailings waste Plaintiff Markham's time, money, and resources.  These harassing junk mailings received by Plaintiff Markham are attributable to National Geographic's unauthorized rental, exchange, and/or disclosure of his Personal Reading Information.  Because Plaintiff Markham is entitled by law to privacy in his Personal Reading Information, and because he paid money for his subscription, National Geographic's disclosure of his Personal Reading Information deprived Plaintiff Markham of the full set of benefits to which he was entitled as a part of his *National Geographic* subscription, thereby causing economic harm.  Accordingly, what Plaintiff Markham received (a subscription without statutory privacy protections) was less valuable than what he paid for (a subscription with accompanying statutory privacy protections), and he would not have been willing to pay as much, if at all, for his *National Geographic* subscription had he known that National Geographic would disclose his Personal Reading Information.

13.     Defendant National Geographic Partners, LLC is a Delaware limited liability corporation with its principal place of business at 1145 17th Street NW, Washington, DC 20036.  National Geographic does business throughout Michigan and the entire United States.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this civil action pursuant to 28

U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

15.     The Court has personal jurisdiction over National Geographic because Plaintiff's claims arose in substantial part from actions and omissions in Michigan, including from Plaintiff's purchase of a *National Geographic* subscription in Michigan, National Geographic's direction of such *National Geographic* subscription into Michigan, and National Geographic's failure to obtain Plaintiff's written consent in Michigan prior to disclosing his Personal Reading Information, including his residential address in Michigan, to another person, the effects of which were felt from within Michigan by a citizen and resident of Michigan.  Personal jurisdiction also exists over National Geographic in Michigan because National Geographic conducts substantial business within Michigan, such that National Geographic has significant, continuous, and pervasive contacts with the State of Michigan.

16.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because National Geographic does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

17.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."  S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy,

respectively).

18.     Recognizing the need to further protect its citizens' privacy rights, Michigan's

legislature enacted the PPPA "to preserve personal privacy with respect to the purchase, rental, or

borrowing of certain materials," by prohibiting companies from disclosing certain types of

sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

19.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in
> the business of selling at retail, renting, or lending books or
> other written materials . . . *shall not disclose* to any person,
> other than the customer, a record or information concerning the
> purchase . . . of those materials by a customer that indicates the
> identity of the customer.

PPPA § 2 (emphasis added).

20.     Michigan's protection of reading information reflects the "gut feeling that

people ought to be able to read books and watch films without the whole world knowing," and

recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual

thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.

This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep.

No. 100–599, at 6 (Statement of Rep. McCandless).

21.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy

Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n

practical terms our right to privacy protects the choice of movies that we watch with our family in

our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec.

S5399 (May 10, 1988).

22.     Senator Leahy also explained why choices in movies and reading materials are so

private:  "These activities are at the core of any definition of personhood.  They reveal our likes

and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people."  *Id.*

23.     Michigan's passage of the PPPA also established as a matter of law  "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter."  *Privacy: Sales, Rentals of Videos, etc.*,  House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit A**).

24.     Despite the fact that thousands of Michigan residents subscribe to National Geographic's publications, National Geographic disregarded its legal responsibility by systematically violating the PPPA.

### *The Personal Information Market:  Consumers' Personal Information Has Real Value*

25.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

26.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

---

[2] The Information Marketplace:  Merging and Exchanging Consumer Data  (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Mar. 26, 2019).

[3] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited Mar. 26, 2019).

27.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[4]

28.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[5]

29.     The scope of data aggregators' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[6]

30.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[7]

---

[4] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2,  *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited Mar. 26, 2019) (emphasis added).

[5] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Mar. 26, 2019).

[6] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Mar. 26, 2019).

[7] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012)

31.     Recognizing the serious threat the data mining industry poses to consumers'
privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus
sent a letter to nine major data brokerage companies seeking information on how those
companies collect, store, and sell their massive collections of consumer data.[8]

32.     In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data
> brokers have developed hidden dossiers on every U.S. consumer.
> This large[-]scale aggregation of the personal information of
> hundreds of millions of American citizens raises a number of
> serious privacy concerns.[9]

33.     Data aggregation is especially troublesome when consumer information is sold
to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail
advertisers often use consumer information to lure unsuspecting consumers into various scams,[10]
including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like
National Geographic share information with data aggregators, data cooperatives, and direct-mail
advertisers, they contribute to the "[v]ast databases of names and personal information" that are
often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within

---

*available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited Mar. 26, 2019).

[8] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited Mar. 26, 2019).

[9] *Id.*

[10] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited Mar. 26, 2019).

the reach of fraudulent telemarketers" and other criminals.[11]

34.    Information disclosures like National Geographic's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[12]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

35.    Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like National Geographic's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

36.    National Geographic is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue:  disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

---

[11] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times,  May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited Mar. 26, 2019).

[12] *Id.*

[13] *Fraud Against Seniors:  Hearing before the Senate Special Committee on  Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited Mar. 26, 2019).

[14] *See id.*

37.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

38.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their personal information.

39.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

40.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

41.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

---

[15] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited Mar. 26, 2019).

[16] *Id.*

[17] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Mar. 26, 2019).

42.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

43.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]  As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### National Geographic Unlawfully Rents, Exchanges, And Discloses Its Customers' Personal Reading Information

44.     National Geographic maintains a vast digital database comprised of its customers' Personal Reading Information. National Geographic discloses its customers' Personal Reading Information to data aggregators and appenders who then supplement that information with additional sensitive personal information about each National Geographic customer, including gender, purchasing habits and charitable. (*See, e.g.*, **Exhibits B-D**).

45.     National Geographic then rents and/or exchanges its mailing lists—which

---

[18] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Mar. 26, 2019).

[19] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited Aug. 30, 2018) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

include subscribers' Personal Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits B–D**).

46.     National Geographic also discloses its customers' Personal Reading Information to data cooperatives, who in turn, give National Geographic access to their own mailing list databases.

47.     As a result of National Geographic's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from National Geographic that identify National Geographic customers by their most intimate details:  income, political affiliation, religious practice, and charitable donations.  National Geographic's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For example, National Geographic will rent—to almost any organization willing to pay for it—a list with the names and addresses of all *National Geographic* customers who are African-American, Republican, over the age of 50, and with a net worth of greater than $500,000.

48.     National Geographic does not seek its customers' prior written consent to any of these disclosures and its customers remain unaware that their Personal Reading Information and other sensitive personal information is being rented and exchanged on the open market.

49.     Consumers can sign up for National Geographic subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, National Geographic never requires the individual to read or agree

to any terms of service, privacy policy, or information-sharing policy.  Consequently, National Geographic uniformly fails to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Personal Reading Information.

50.     As a result, National Geographic disclosed its customers' Personal Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[20] – to anybody willing to pay for it.

51.     By and through these actions, National Geographic has intentionally disclosed to third parties its Michigan customers' Personal Reading Information without consent, in direct violation of the PPPA.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff seeks to represent a class defined as all Michigan residents who, at any point in time between March 26, 2016 and July 30, 2016, had their Personal Reading Information disclosed to third parties by National Geographic without consent (the "Class").  Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

53.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

---

[20] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited Mar. 26, 2019).

54.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  (a) whether National Geographic is a "retailer or distributor" of publications (*i.e.*, magazines); (b) whether National Geographic obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information; (c) whether National Geographic's disclosure of Plaintiff's and the Class's Personal Reading Information violated the PPPA; and (d) whether National Geographic's rental, exchange, and/or disclosure of Plaintiff's and the Class's Personal reading Information constitutes unjust enrichment.

55.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

56.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

57.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also

presents a potential for inconsistent or contradictory judgments.  In contrast, the class action

device presents far fewer management difficulties and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single court on the issue of

Defendant's liability.  Class treatment of the liability issues will ensure that all claims and

claimants are before this Court for consistent adjudication of the liability issues.

**COUNT I**
**Violation of the Preservation of Personal Privacy Act**
**(PPPA § 2)**

58.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully

set forth herein.

59.     Plaintiff brings this claim individually and on behalf of members of the Class

against Defendant National Geographic.

60.     As a magazine publisher that sells subscriptions to consumers, National

Geographic is engaged in the business of selling written materials at retail.  *See* PPPA § 2.

61.     By purchasing a subscription to *National Geographic* magazine, Plaintiff

purchased written materials directly from National Geographic.  *See* PPPA § 2.

62.     Because Plaintiff purchased written materials directly from National Geographic,

he is a "customer" within the meaning of the PPPA.  *See* PPPA § 1.

63.     At various times between March 26, 2016 and July 30, 2016, National

Geographic disclosed Plaintiff's Personal Reading Information, which identified him as a

*National Geographic* customer, in at least three ways.

64.     First, National Geographic disclosed mailing lists containing Plaintiff's Personal

Reading Information to data aggregators and data appenders, who then supplemented the mailing

lists with additional sensitive information from their own databases, before sending the mailing

20

lists back to National Geographic.

65.     Second, National Geographic disclosed mailing lists containing Plaintiff's Personal Reading Information to data cooperatives, who in turn gave National Geographic access to their own mailing list databases.

66.     Third, National Geographic rented and/or exchanged its mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

67.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and National Geographic was able to increase its profits gained from the mailing list rentals and/or exchanges.

68.     By renting, exchanging, or otherwise disclosing its customer lists, between March 26, 2016 and July 30, 2016, National Geographic disclosed to persons other than Plaintiff records or information concerning his purchase of written materials from National Geographic. *See* PPPA § 2.

69.     The information National Geographic disclosed indicates Plaintiff's name and address, as well as the fact that he subscribed *National Geographic*.  Accordingly, the records or information disclosed by National Geographic indicate Plaintiff's identity.  *See* PPPA § 2.

70.     Plaintiff and the members of the Class never consented to National Geographic disclosing their Personal Reading Information to anyone.

71.     Worse yet, Plaintiff and the members of the Class did not receive notice before National Geographic disclosed their Personal Reading Information to third parties.

72.     On information and belief, National Geographic's disclosures, between March 26,

2016 and July 30, 2016, of Plaintiff's and the Class's Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

73.     National Geographic's disclosures, between March 26, 2016 and July 30, 2016, of Plaintiff's and the Class's Personal Reading Information were not made to collect payment for their subscriptions.

74.     National Geographic's disclosures, between March 26, 2016 and July 30, 2016, of Plaintiff's Personal Reading Information were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase National Geographic's revenue. Accordingly, National Geographic's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

75.     By disclosing Plaintiff's Personal Reading Information, between March 26, 2016 and July 30, 2016, National Geographic violated Plaintiff's and the Class's statutorily-protected right to privacy in their reading habits.  *See* PPPA § 2.

76.     Additionally, because Plaintiff and the members of the Class paid for their subscriptions to National Geographic's publications, and National Geographic was obligated to comply with the PPPA, National Geographic's unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information deprived Plaintiff and the Class members of the full value of their paid-for subscriptions.  Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, National Geographic's unlawful rental, exchange, and/or other disclosure of their Personal Reading Information caused them to receive less value than they paid for, thereby causing them economic harm.

77.     Likewise, because Plaintiff and the other Class members ascribe monetary value

to the privacy of their Personal Reading Information, a magazine publication subscription that keeps their Personal Reading Information private is more valuable than one that does not.

78.     Accordingly, had Plaintiff been adequately informed of National Geographic's disclosure practices, he would not have been willing to purchase his *National Geographic* subscription at the price charged, if at all.  Thus, National Geographic's unlawful disclosures caused Plaintiff economic harm.

79.     National Geographic's disclosure of Plaintiff's Personal Reading Information to third parties has also caused an influx of third party print advertisements.

80.     As a result of National Geographic's unlawful disclosure of their Personal Reading Information, Plaintiff and the members of the Class have suffered privacy and economic injuries.  On behalf of himself and the Class, Plaintiff seeks:  (1) an injunction requiring Defendant National Geographic to obtain consent from Michigan customers prior to the disclosure of their Personal Reading Information as required by the PPPA; (2) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to PPPA § 5(a); and (3) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## COUNT II
### Unjust Enrichment

81.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

82.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant National Geographic.

83.     Plaintiff and the Class members conferred benefits on National Geographic by providing National Geographic with their Personal Reading Information and paying National Geographic for their magazine publication subscriptions.

23

84.     National Geographic received and retained the information and money belonging to Plaintiff and the Class when Plaintiff and the Class subscribed to National Geographic's publications.

85.     Because National Geographic received and processed Plaintiff's and the Class's subscription payments and Personal Reading Information, and because National Geographic has employees and/or agents handling customer accounts and billing as well as customer data, National Geographic appreciates or has knowledge of such benefits.

86.     Under the PPPA, Plaintiff and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

87.     Under principles of equity and good conscience, because National Geographic failed to comply with the PPPA, National Geographic should not be allowed to retain the full amount of money Plaintiff and the Class paid for their subscriptions or the money it received by renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading Information.

88.     Moreover, National Geographic should not be allowed to retain the monies it received as a result of renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading Information.

89.     Plaintiff and the other Class members have suffered actual damages as a result of National Geographic's unlawful conduct in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information.  This amount is tangible and will be calculated at trial.

90.     Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as National Geographic's failure to inform them that it would disclose their Personal

Reading Information caused them to purchase magazine publication subscriptions when they otherwise would not have.

91.    Further, a portion of the purchase price of each National Geographic magazine subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the PPPA.  Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

92.    To prevent inequity, National Geographic should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from National Geographic's rental, exchange, and/or other disclosure of Plaintiff's and the Class's Personal Reading Information.

93.    Accordingly, Plaintiff and the Class members seek an order declaring that National Geographic's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by National Geographic through its rental, exchange, and/or other disclosure of Plaintiff's and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

94.    WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

> A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.  For an order declaring that Defendant's conduct as described herein violates the Preservation of Personal Privacy Act, PPPA;

C.  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.  For an award of actual damages or $5,000, whichever is greater, to Plaintiff and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.  For prejudgment interest on all amounts awarded;

F.  For an order of restitution and all other forms of equitable monetary relief; and

G.  For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  March 26, 2019                    Respectfully submitted,

**MARK MARKHAM**,

By: ____*/s Philip L. Fraietta*_____
One of Plaintiff's Attorneys

Joseph I. Marchese
jmarchese@bursor.com
Philip L. Fraietta
pfraietta@bursor.com
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

Frank S. Hedin
fhedin@hedinhall.com
HEDIN HALL LLP
1395 Brickell Avenue, Suite 900

26

Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801

*Counsel for Plaintiff Mark Markham*